This is an appeal from a judgment of conviction and sentence on a trial by jury *597 under an indictment alleging in pertinent part the following:
“MARK PHILLIP HICKS ... did knowingly obtain or exert unauthorized control over $5,700.00 in lawful currency or coinage ... of the value of $5,700.00, the property of Donnie Webb, with the intent to deprive the said owner of the said property, in violation of Section 13A-8-3 of the Code of Alabama, ....”
The cited section of the Code recites in pertinent part that the “theft of property which exceeds $1,000.00 in value ... constitutes theft of property in the first degree” and that “Theft of property in the first degree is a Class B felony.” Section 13A-5-6(a)(2) provides that a Class B felony is punishable by imprisonment for “not more than 20 years or less than 2 years.”
By consent of all parties concerned, the case was tried jointly with a case against Tommy Bailey, who was present with this appellant at the time of the alleged crime and was charged by separate indictment with having committed the same specific crime. The jury found Tommy Bailey not guilty. Bailey and this appellant were represented on the trial by separate attorneys.
According to the undisputed evidence, the case had its inception in the plan of law enforcement authorities and one Donnie Webb, who was serving a term of ten years at Draper Prison for a then-recent conviction for the sale of cocaine, for Webb to purchase cocaine from appellant. Webb and the appellant were personally acquainted with each other and for years had had business dealings with each other. Despite the meticulous care taken by the officers and Webb, while acting as an informer with money supplied by the officers, the plan aborted to the chagrin of the planners, by the appellant’s seizure of the money, totalling $5,700.00, furnished to purchase the cocaine, but without the accomplishment of the sale of any cocaine. We now consider the three issues presented in the brief of counsel for appellant.
I.
Appellant’s first issue is thus captioned, “Did the court err in denying the Defendant’s Motion for Dismissal at the close of the State’s Case on the grounds of entrapment?” The following is the first paragraph of appellant’s argument as to the issue:
“This is a clear case of entrapment. It is obvious the police made a deal with Donnie Webb, a convicted dope dealer and drug addict, who had previously been sentenced to Draper Prison approximately three to four months prior to this trial. The police had Webb, who obviously from his testimony is ¾ miserable creature, telephone his friend, Mark Hicks, the Defendant, to inquire as to whether he could find some cocaine.”
Appellant’s attorney continues his argument as to the issue by reciting in detail the efforts made by the authorities and by Donnie Webb to obtain the purchase of cocaine from this appellant, as to which there was abundant evidence, and contends that the facts in this' case are sufficient to show that defendant should have been acquitted for the alleged crime of theft, irrespective of the fact that whatever entrapment was involved consisted of a trap set for a seller of cocaine and not a trap for a thief. In the reply to the contention of appellant, appellee’s attorney reasons correctly, we think, that, as there was no evidence that anyone sought to entrap defendant into committing the crime of theft, of which he was convicted, any contention that his conviction was rendered invalid by reason of the defense of entrapment cannot be sustained. Appellant’s attorney replies to the brief of counsel for appellee on the point by correctly stating, “Entrapment has been defined as the inducement of one to commit a crime not originated by him, for the purpose of instigating criminal charges against him [emphasis supplied],” a statement found at 21 Am.Jur.2d, Criminal Law § 202 (1981).
Perhaps no case directly in point is to be found, but we conclude that the defense of entrapment is not applicable in the case sub judice, inasmuch as no person seeking to entrap defendant sought to induce him to *598 commit the alleged crime of theft. The plan to commit the overt act of the alleged crime originated in the mind of defendant-appellant alone. Appellant’s first issue is without merit.
II.
By appellant’s Issue II, he contends the evidence was not “sufficient to support the finding of guilty by the jury.” Based on the testimony of the defendant, who took the stand in his own behalf, there is much to be said in favor of appellant as to his second issue. The defendant testified at length and insisted therein that he had done business with Donald Webb, had engaged in many activities with him, had gambled with him, and that on the date of the alleged crime Donnie Webb owed defendant $5,700.00, that when Webb proposed to buy cocaine from defendant, defendant conceived of the opportunity to collect the money Webb owed him by letting Webb know that he would sell Webb cocaine. They first discussed a much lesser amount of money and finally concluded that defendant was to sell Webb an amount that would cost $5,700.00. Elaborate arrangements were made between them whereby they were to meet at Hardee’s Restaurant on Lower Wetumpka Road in Montgomery, that defendant was to have the cocaine in his own motor vehicle, and that it would be transferred therefrom to the motor vehicle driven at the time by Webb in exchange for the $5,700.00 to be paid by Webb. Before going to Hardee’s, defendant talked with Ronnie Best and Tommy Bailey and came to an understanding with Tommy Bailey that defendant was going to collect some money, that he would need Bailey’s help in keeping the money from being retaken by the person from whom defendant would collect it and that Tommy Bailey would be in the restroom at Hardee’s at the time. The defendant’s testimony continued as follows:
“Q. All right. Now, when you got there, tell this jury what happened.
“A. I got there and I seen Donny Webb. He got out of his car and I got out of my truck. We started talking. He asked me did I have the stuff, and I said yes. And I asked him did he have the money, and he said yes. He said, is the stuff any good? And I said sure. And he said well, I’m not even going to try it; I’ll take your word for it. He said, I need to go; I’m in a hurry. I said, well, let me see the money. So we proceeded to the back of his ear. He opened up the trunk.

“A. He proceeded to open it up. When he did, he came out with a bunch of one hundred dollar bills. He counted them out, and I said it looked like it was marked money. I said, count it for me again. He counted it again, and he said here, now where’s the stuff? I said thank you, we are even, and I proceeded to walk away.

“Q. And then what happened?
“A. He looked at me and said — you know, like, what the hell is going on? But I didn’t pay no attention to him; I walked straight to the bathroom.
“Q. You walked to the bathroom, how far were you from the bathroom?
“A. I would say ten or fifteen feet at the most.

“Q. And what did you do in the bathroom?
“A. Handed Tommy the money.
“Q. And then what happened then?
“A. I turned around and walked right outside.
“Q. When you walked outside, what happened?
“A. I seen just all kinds of guns in my face.
“Q. When you saw these guns in your face, where was Donny?
“A. I don’t know.

“Q. What happened after that?
“A. They told me to get to the floor — to the pavement rather.
*599 “Q. Did you go down to the police station?
“A. Yes, sir.
“Q. Approximately how long were you at the police station?
“A. Several hours.
“Q. Would you tell the Court and the jury what you remember took place at the police station?
“A. One officer said it’s a good thing that I didn’t grab him or push him because that would have been armed robbery. I said, I don’t know what you are talking about. Because I didn’t know if it was robbery or whatever. I mean, it surprised me for him to say that. And I told him he owed me the money, and that’s the only way I knew to get my money back.”
The testimony of Donnie Webb was consonant in many respects with the testimony of defendant, but in essence it was exactly the opposite, which is emphatically shown by the following part of Webb’s testimony:
“Q. And when you have lost money, you have needed again additional money to stay in the game, haven’t you?
“A. Ever once in a while.
“Q. Every once in a while. And there have been occasions there at Jimmy’s when Mark had been present when the gambling was going on along with you; isn’t that true?
“A. Yes, sir.
“Q. And on those occasions when you needed money, you had to borrow money from somebody, didn’t you?
“A. Yes, sir.
“Q. And on those occasions, your friend there was the one that loaned you the money, wasn’t he?
“A. Not — no, sir.
“Q. You do not recall borrowing any money from Mark over all of those years when you were gambling?
“A. I ain’t ever borrowed a dime from Mark Hicks.
“Q. You never borrowed a dime from Mark Hicks?
“A. No, sir.”
This essential difference between the testimony of Webb and that of Hicks necessitates a determination of appellant’s second issue adversely to him.
III.
By appellant’s third issue, he contends that the trial court erred in denying defendant’s motion for a new trial. The kernel of appellant’s position as to this issue is to be found in the following sentences in the brief of counsel for appellant:
“Defendant submitted a Motion for a New Trial, urging as grounds therefor the irregularity of an important State witness, Robert Thornton, a City investigator, talking to a juror during the course of the trial. We submit the court erred in not granting the same.”
The motion for new trial is in nine numbered parts, referred to therein as grounds. Seven of the nine pertain to Investigator Thornton or the mentioned juror, and nothing else. One of the other two numbered parts of the motion states that the trial court erred “in permitting the District Attorney to comment to the jury that the Defendant was a known drug dealer when no evidence of such was ever at any time introduced into evidence.” One numbered part of the motion merely states, “that on the 22nd day of June, 1984, the jury in the above-styled cause rendered a verdict finding the Defendant guilty of Theft 2.”
Two witnesses testified on the hearing of the motion for a new trial. They were Investigator Robert Thornton of the Montgomery Police Department and Ronald Best; both of them had been witnesses on the trial of the case. Best testified that on a recess of the trial, one of the jurors spoke and shook hands with Officer Thornton and they “talked for a few minutes ... three or four minutes, like that.” According to Officer Thornton’s version of a talk with one of the jurors, the following occurred:
“Q. Let me ask you this: If you will recall the members of that jury consisted of eight white people and four black; did you have occasion to talk to any of those four black people?
*600 “A. As far as I know, sir, one of the gentlemen did approach me and he shook my hand and we talked, but we didn’t talk about the case. As a matter of fact, it was so trivial I don’t remember what we talked about.
“Q. You say one of the jurors approached you and talked to you; is that correct?
“A. When the jury came out.
“Q. For recess?
“A. Right, he spoke to me, how you doing, like that.
“Q. Had you ever seen this juror before?
“A. Not until that day.
“Q. How long did you talk with him?
“A. At, the most maybe a minute, maybe two minutes. Investigator Alexander was standing right there.

“Q. Calling your attention to the name Henry Swearer, does that name ring a familiar chord with you?
“A. No, sir.
“Q. When you talked with this juror, isn’t it true your conversation lasted during almost the entire recess?
“A. I don’t know, sir.
“Q. Did you make known to the Court or District Attorney that you had talked in any shape, fashion or form to any member of the jury?
“A. No.
“Q. Did anyone else on the jury talk to you during this trial?
“A. As far as — not that I can remember. Like I said, I didn’t even remember Mr. Swearer, as you said that’s his name, I didn’t even remember him.
“Q. To be quite frank with you, Mr. Thornton, I don’t have which name it was but I’ve an opinion it could be Swearer, but it could be one or two others, too.
“A. Like I told the District Attorney, I don’t remember talking to any of the jurors. I know, for myself, the twelve people sitting here when I testified, I knew none of them and I had never seen any of them until that day.
“Q. Would it not be true, then, this particular juror gave you a hi, welcome, and gave the appearance of having known you before?
“A. Would that not be true?
“Q. Would that be true or untrue?
“A. Untrue.
Before the testimony was closed on the hearing of the motion for a new trial, Investigator Thornton was recalled as a witness and testified that he was “originally from ... Bullock County,” that he had never lived in Montgomery, prior to the four years he had lived in Montgomery, that where he lived in Bullock County was about thirty miles from the south end of Montgomery County. The grand finale of his testimony on the subject was the following:
“Q. Were you aware of the fact that the juror I may have in mind, Henry Swearer, resided in Grady, Alabama?
“A. I don’t even know where Grady is.
“Q. Would you be surprised to know that Grady is in the southern end of Montgomery County?
“A. Yes, sir, I would be.”
We have no hesitancy in following the authorities cited by appellant about contacts made between a party in a case, or one having a partisan interest in the case, with some of the members of a jury during the progress of the trial of the case, in such cases as those cited by appellant of Cox v. Tomlin, 19 N.J.L. 76 (1842); Briggs v. Prowell, 215 Ala. 604, 112 So. 197 (1927); Atlantic Coast Line R. Co. v. Hardwick, 239 Ala. 58, 193 So. 730 (1940), particularly that which was stated and held in Briggs v. Prowell, 112 So. at 199, 215 Ala. at 601:
“As stated by the New Jersey court, and as reiterated by this court in Craig v. Pierson Lbr. Co., supra, [169 Ala. 548, 53 So. 803 (1910)], whether or not the juror was influenced by what was said to him, is of too difficult and delicate a character for judicial determination, but it is sufficient if the party to the cause was in private conversation with the juror on the subject of the trial. ‘So del *601 icate are the balances in weighing justice that what might have seemed trivial under some circumstances would turn the scales to its perversion.’ Craig v. Pier-son Lbr. Co., supra. And, as said in L & N.R. Co. v. Turney, supra, [183 Ala. 398, 62 So. 885]:
‘A party litigant who does not understand the gravity of such an offense must be made wise even at the cost of setting aside his verdict.’ ”
The cases cited and relied upon by appellant are distinguishable from the case sub judice in that in the instant case the undisputed evidence shows, as stated by Officer Thornton:
“Now, as far as I know, sir, one of the gentlemen did approach me and he shook my hand and we talked, but we didn’t talk about the case. As a matter of fact, it was so trivial I don’t remember what we talked about.”
We conclude from our review of the court reporter’s transcript that the conversation between Officer Thornton and the juror should have been avoided but that each was innocent of any intentional impropriety, that whatever brief conversation there was was merely casual and that the juror was not influenced thereby. The transcript indicates that the trial judge gave the only point mentioned in the motion for a new trial due consideration, as shown by his remarks at the conclusion of the hearing of the motion. We are persuaded that the trial court was not in error in denying defendant’s motion for a new trial.
It follows that, as all the issues presented on appeal are decided adversely to appellant and as no obvious error prejudicial to defendant was committed by the trial court, its judgment should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All Judges concur.